(No. 20095.—

MARY NEVILLE MURPHY, Appellee, *vs.* MARTHA NEVILLE
SAMPSON *et al.* Appellants.

*Opinion filed December 18, 1930—Rehearing denied Feb. 4, 1931.*

H. WARD HEIDENRICH, (VIAN WESTBROOK, of counsel,) for appellants.

THOMAS F. BURKE, for appellee.

Mr. COMMISSIONER EDMUNDS reported this opinion:

Mary (sometimes referred to as Mamie) Neville Murphy, appellee, filed a bill in the superior court of Cook county against her mother, Martha Neville Sampson, her step-father, Henry C. Sampson, and Libby Reynolds. The bill prayed specific performance of a written contract whereby Libby Reynolds and her husband, John Reynolds, (who died prior to the filing of the bill,) agreed to convey certain real estate, and for an accounting by the Sampsons for the use and occupation of the premises. The cause was referred to a master, who filed original and supplemental reports. From the decree subsequently entered, which followed the recommendations of the master's reports and granted the relief prayed, Mr. and Mrs. Sampson have appealed.

The property in controversy is at No. 7000 South State street, Chicago, and is hereinafter referred to as the State street property. The contract whereby John and Libby Reynolds agreed to convey it was executed March 20, 1920. Appellee's father had died shortly before that time, after a long period of illness, and her mother had not yet remarried. Appellee, who was born February 9, 1896, was then unmarried. By the terms of the contract her mother was named as the purchaser, and upon compliance with the terms relating to payment, conveyance was to be made to the mother. The purchase price was $6000. The initial payment of $1000 was made by a check drawn by appellee, and further payments totaling $2082.97, principally in the form of checks drawn by her, were subsequently made. On May 3, 1920, her mother executed to appellee a quit-claim deed to the premises. In September, 1923, appellee executed mortgages on the premises in the sum of $3800, payable in monthly installments, and out of the proceeds Mrs. Reynolds received the unpaid balance due under the contract

of purchase. Subsequently payments totaling $479.05 were made to the mortgagee by checks of which appellee was the drawer. There were three policies of insurance on the premises, and two of these were assigned to appellee. The third policy bore a rider carrying the name of her mother. On January 6, 1924, there was a fire. Appellee's mother released her interest under the third policy, and the balance due on the above mortgages was paid out of the fire loss. The remainder of the insurance money was received by a contractor who restored the premises and to whom $503 is still due. Before the fire appellee drew checks for storm doors, plumbing, painting, lumber, etc., in the sum of $574.90. She also drew checks for taxes on the State street property and other property in the total sum of $537.10. Her mother married Henry C. Sampson in 1921. Prior to August, 1922, appellee lived with her sister, Rachel, who was born February 10, 1898, and her mother and step-father, in what is referred to as the Brighton Park property, both apartments of the State street property being rented to tenants. In August, 1922, the Brighton Park property was sold and they all moved to the State street property, occupying one of the apartments together until the fire. Appellee was married in October of 1923, although she did not tell her mother of it until the next spring. On May 29, 1924, after the premises were restored, appellee's mother and step-father and Rachel moved into one of the two apartments and appellee and her husband moved into the other.

The issue presented by the case is whether appellee or her mother became entitled, under the contract, to the State street property. The circumstances already outlined may be taken to be satisfactorily established. Appellants' contention is, that, regardless of the form of the transactions in which the payments were made, the mother bought the property for her own use and that it was her money which paid for it. Appellee contends that the money paid was

her own and that the property was bought for her use. In so far as the evidence bears on these respective contentions it is in a state of conflict.

Mrs. Sampson, the mother, testified that she had received a total of $2750 from the Maccabees, representing life insurance upon a cousin who died in 1911 and her first husband; that she had acquired the Brighton Park property and saved up some money prior to 1919 but never had a bank account; that she did not want to write checks; that in 1919 appellee induced her to turn over $750 thus saved, which was used to start an account in appellee's name; that because it was in the family, witness did not think anything about this; that thereafter she turned over to appellee not only her own savings but certain sums contributed by Rachel, and all of these amounts went into appellee's account; that appellee paid nothing toward the living expenses; that at the time of buying the State street property witness asked appellee to turn back witness' money; that when the contract for the property was signed she gave appellee $600 worth of Liberty bonds, which witness had bought from the precinct captain, and $150 in cash; that after this transaction she collected the rents on the State street property and turned them over to appellee; that the quit-claim deed from her to appellee was executed at appellee's request on the ground that witness was likely to "drop off" in one of the sick spells to which she was subject and the property could thereby be kept out of the probate court; that at the same time a quit-claim deed covering the property was executed and delivered by appellee to witness; that U. G. Weir was present when this was done; that this latter deed was put in an unlocked drawer, from which it subsequently disappeared; that witness paid out $350 for appealing a case which she had against the Alton railroad; that appellee sold the Brighton Park property, upon which there was a $1000 mortgage, for $2200 and never accounted to witness for the money, and that witness

paid for the sidewalk, sewer, painting, roofing, and all other expenses connected with the State street property. The mother's testimony as to the execution of a quit-claim deed back from appellee was corroborated by Champion J. Warring, a lawyer, who testified that two deeds covering the State street property were made out under his direction by U. G. Weir, appellee being the grantee in the one executed by the mother and the mother being the grantee in the one executed by appellee; that appellee signed in his office the deed in which her mother was named as grantee, and that appellee said the State street property was her mother's. Weir testified that he made out the two deeds; that appellee signed in Warring's office the one in which she was grantor; that he took both deeds out to the Brighton Park place, where appellee's mother signed hers, and that he then gave the mother both deeds, with the stamps on. The mother's testimony as to buying Liberty bonds was corroborated by appellee's sister, Rachel, who also testified that she was steadily employed and gave to her mother all the money she earned. Further evidence upon which the mother relied to show her right to the property centered around a warranty deed describing the State street property, allegedly made out about the time the $3800 mortgages were given, executed by Mrs. Reynolds as grantor and naming the mother as grantee. Walter Pfeiffer, secretary of the building and loan association which made the $3800 loan to appellee, testified that when the deal was closed Mrs. Reynolds brought to his office such a deed but that witness could not remember what became of it. Bernard Barnard, an attorney, testified that in connection with the adjustment of the fire loss in 1924 he went with appellee's mother to the law offices of Litsinger, Healy & Reid, and that Pfeiffer had a deed of that description there and turned it over to appellee's solicitor. Thomas F. Burke, appellee's solicitor, called as a witness by appellants, testified that he had such a deed at one time; that he placed it in

an unlocked file, and that he had recently made a search for it but could not find it.

Appellee's testimony was that she started to work out for board, room and schooling when she was eleven years old; that subsequently she worked a year and a half or two years at three dollars per week, turning the money over to her mother; that at the age of sixteen she commenced working for the telephone company and worked there continuously until October of 1924; that she received five dollars per week at the start, and her wages were gradually raised until the last five or six years she worked she received $31.69 per week; that she had on hand $200 in cash of her own before she started her bank account; that she saw the State street property advertised and wanted to buy it; that her mother said witness could not buy it because she was only a working girl without backing; that her mother said she would buy it and make it over to witness later; that when the check was drawn for the first payment witness had the necessary amount on deposit in her name, having added to other money on deposit and belonging to her $700 obtained by putting up as collateral Liberty bonds purchased by her from the precinct captain, together with telephone company stock; that subsequent payments on the contract were made out of her earnings and the rents collected from the premises; that she received none of her mother's money for deposit in the bank, but that her mother turned over to her some money from Rachel, which was for Rachel's board; that witness paid all the household bills and sometimes sent her mother with a check to pay them; that her mother got $1000 from the Maccabees and paid it on the Brighton Park property; that the amount realized on sale of the Brighton Park property in 1922 was $1312.44, and that she explained to her mother verbally how this was spent.

Testimony by a superintendent of the telephone company, called as a witness by appellants, showed the rates

of pay earned by appellee in various years prior to 1917, and that in 1917 she received $671.50, in 1918 $868.58 and in 1919 $1195.79. The superintendent's testimony also disclosed that in 1917 appellee paid for two shares of stock of the par value of $100 per share, bought a $50 Liberty bond on the second drive, two bonds on the third drive and two bonds on the fourth drive. That appellee borrowed money as alleged by her was corroborated by Rudolph Mourek, of the bank where appellee's account was kept, who testified to the making on March 12, 1920, of a $700 loan upon the security of Liberty bonds and telephone company stock.

Other testimony introduced tended to show admissions by appellee's mother that appellee was the owner of the State street property. Frank Hoffman, an appraiser for the building and loan association which made the $3800 loan, testified that when he called to examine the property appellee's mother said, "I have nothing to do with the property; it belongs to my daughter." William Warnock, a cement contractor who put in a floor, testified that appellee's mother told him, "Mamie bought this property awfully cheap." In addition to this testimony appellee introduced in evidence an affidavit filed by her mother on June 1, 1921, for the purpose of setting aside a judgment in a suit brought in the municipal court of Chicago by the Elaborated Ready Roofing Company against her mother as defendant. In the course of the affidavit it is alleged by appellee's mother that "she is not indebted to the plaintiff in the above cause in the sum of $50 for roofing work and material furnished for the premises at No. 7000 South State street; * * * that she did not sign contract dated May 13, 1920, nor any contract whatever for such work; that on said May 13, 1920, this defendant was not, and not now is, the owner of said premises, * * * and that her daughter, who is the owner of the premises upon which the work was done, is named Mamie Neville." This affidavit is supplemented by

one executed by appellee, in which it is alleged that "this affiant, and she alone, has done all the business with said roofing company. * * * And this affiant further says that Martha Neville does not own said premises, neither does she owe any sum or sums of money whatever for work done on said premises, and that all responsibility for the up-keep of said premises and for taxes, etc., belong to affiant, and Martha or Mrs. N. Neville has nothing whatever to do with said premises or its up-keep."

After the original report of the master was filed on March 16, 1929, a re-reference was had, and appellants introduced in evidence a deed conveying the State street property, dated May 3, 1920, purporting to be executed by appellee to her mother and acknowledged before U. G. Weir, a notary public. It was made out upon a blank form purporting to be printed and sold by the Chicago Legal News Company. It had been recorded March 27, 1929. No testimony was offered by appellants in this connection. Appellee testified that she did not sign said instrument and did not authorize anyone to do so for her; that she never acknowledged it before Weir; that the Thursday before Memorial Day of 1929 she was in her pantry and could hear her mother's voice through the wall say, "I put the deed on record; what can she do about it, once it is on record?" and that Rachel said, "She is liable to go in and say it is not hers." Appellee called as witnesses W. D. Mosley, secretary of the Chicago Legal News Company, and Nora F. Talty, an employee of that company for thirty-eight years. Their testimony tended to show that the blank form upon which the deed was made out had not been printed prior to 1928. Appellee also called Howard A. Rounds, a handwriting expert, who gave it as his opinion that the signature of appellee on the instrument was a forgery; that it was not typed on the same typewriter as the quit-claim deed from the mother to appellee; that erasures, double initials and double dates appear upon the revenue stamps, and

that the stamps are attached with adhesive which is different from that on original stamps.

The master and chancellor found that the contract to purchase the State street property was entered into for the benefit of appellee; that she made the first and all subsequent payments out of her own funds and finished paying for the property in full in 1923, and that her mother and step-father have no right or interest in the premises. These findings are attacked by appellants on the ground that the evidence is overwhelmingly to the effect that although appellee drew the checks with which the various payments were made, the money which went into the State street property was not appellee's but her mother's. Conceding that the mother did turn over money which went into appellee's bank account, the evidence shows that appellee herself had been working and earning money for a number of years prior to the execution of the contract, and that for at least two or three years prior thereto her earnings had been substantial in amount. It also shows that she had saved and invested, out of her earnings, some hundreds of dollars at the least. After the first payment was made substantial amounts accrued from rentals, and these were collected and applied on the contract. In the meantime her earnings were continuing. Other evidence tends to show that the mother affirmatively disclaimed ownership of the property. In our opinion the findings are amply supported by the evidence and we would not be warranted in disturbing them. In answer to the further contention in this connection that error was committed in admitting in evidence certain checks drawn by appellee prior to the date the amounts became due under the mortgage executed by her, the insurance policies assigned to her, the application made by her for the loan and the testimony of Warnock, and that the findings must have been based, in part, upon this incompetent evidence, it should be said that even if the evidence thus complained of be regarded as incompetent, the competent evi-

dence remaining is of such force that the findings must be allowed to stand. *Waggoner* v. *Clark,* 293 Ill. 256; *Lingle* v. *Bulfer,* 322 id. 606.

Appellants contend that the chancellor erred in not finding that the warranty deed in which Mrs. Reynolds was named as grantor and appellee's mother as grantee, was executed, acknowledged and delivered by the grantor and vested title to the State street property in the mother. A further contention made by appellants is that the decree can not be supported because there is nothing to show that Mrs. Reynolds was the devisee of her husband and therefore able to convey a good title to the property. Apart from the question of the propriety of appellants seeking to maintain both of these contentions concurrently, it must be said that there is no merit in either. The master and chancellor found, and with ample warrant, that appellee was the beneficiary of the contract and that hers was the money which was used to pay for the property. A finding that the legal title was conveyed to her mother would have conferred upon appellants no substantial right of which the chancellor in this case could take cognizance. Whether or not Mrs. Reynolds can convey a good title to appellee is a question that does not concern appellants, and their argument in this particular cannot be heard. *Press* v. *Woodley,* 160 Ill. 433.

It is contended that the chancellor erred in decreeing that appellants pay to appellee the fair, reasonable and customary rental value of the portion of the premises occupied by them between May 29, 1924, and the date of vacation of the premises, such sum to be ascertained upon a re-reference. The authorities relied upon in this connection hold that the law implies no contract whereby members of the same family who perform services for each other are entitled to remuneration for so doing, and that no relation of landlord and tenant can be assumed in the absence of express contract or the existence of an arrangement from

which such relation may be implied. These authorities have no application here. Two families are involved—not one— and the obligation to pay is not here based upon the relation of landlord and tenant. Appellee's mother testified that appellants moved in on May 29, and that she went over and went in ahead of appellee because appellee had told people at the City Hall that she was going to put a vicious bull dog in there and bar the windows and doors so appellants could not get in. Where a party enters without authority upon the possession of another's premises and uses them, compensation may be awarded the owner upon the basis of the worth of the use of the property. *McWilliams* v. *Morgan*, 75 Ill. 473; *Coleman* v. *Connolly*, 242 id. 574; *DeCamp* v. *Bullard*, 159 N. Y. 450; *Martin* v. *Porter*, 5 M. & W. 351; *Phillips* v. *Homfray*, L. R. 6 Ch. App. 770.

Appellants insist that inasmuch as their solicitor withdrew from the case before the date set for closing proofs, necessitating the substitution of other counsel, the master erred in refusing to extend the time for the closing of proofs. The original report of the master was filed March 16, 1929, nearly four years after the taking of proofs began, and on June 3, 1929, appellants produced in open court the purported deed from appellee to her mother, recorded March 27, 1929, and moved for a re-reference for the purpose of determining its validity. Re-reference for such purpose was ordered, and at the hearing before the master on June 10 appellants introduced the deed in evidence and rested. The testimony of Warring and Weir, who claimed to have prepared such an instrument and knew the circumstances surrounding it, had been heard in detail on the original reference. Adjournment was taken to June 24. No further evidence was then offered, and the master entered an order to close proofs on July 8. The withdrawal and substitution of solicitors occurred on June 28. Whether or not the motion for more time, made ten days later, should be allowed depended upon the exercise of a sound legal dis-

cretion, and under all the circumstances disclosed by this record we are not prepared to say that this discretion was abused when the motion was denied.

The decree of the superior court is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Decree affirmed.*